[Civ. No. 16266. First Dist., Div. Two. Mar. 29, 1955.]

A. A. BROCK, as Director of Agriculture, etc., Respondent, v. WESTERN NATIONAL INDEMNITY COMPANY (a Corporation), Appellant.

Worthington, Park & Worthington and Leonard A. Worthington for Appellant.

Edmund G. Brown, Attorney General, W. R. Augustine and Wayne D. Hudson, Deputy Attorneys General, for Respondent.

KAUFMAN, J.—This is an appeal by defendant Western Indemnity Company from a judgment of the Superior Court in and for the County of San Francisco, in favor of plaintiff and respondent, A. A. Brock, Director of Agriculture of the State of California. The director brought the action, under provisions of the Agricultural Code, on behalf of various producers of farm products, to recover upon the bond furnished by appellant to Clara-Val Packing Company, the debtor.

The surety bond was given pursuant to section 1300.1a of the Agricultural Code which requires all processors of farm products to post a $5,000 bond with the director conditional upon the payment to farmers for farm products delivered during the period of its license. Clara-Val Packing Company obtained a processor's license under the state, and appellant executed its bond covering the period May 15, 1946, to May 14, 1947, and from May 15, 1947, to May 14, 1948. The first cause of action sought recovery of $2,637.12, the balance due creditors for products delivered to the debtor during the 1946-1947 season. The second cause of action prayed for $5,000, the full amount of the bond, for the period 1947-1948. Appellants raised the defenses of the statute of limitations, laches, estoppel, and alteration of the original obligation without the surety's consent. Judgment in favor of respondent was rendered in the sum of $7,637.12. Motion for new trial having been denied, this appeal was taken.

Section 1300.1a, under which the present suit was brought, reads as follows:

"Before any license is issued to any processor . . . the applicant shall execute and deliver to the director a surety bond. . . .

"Said bond shall be conditioned upon compliance with the provisions of the chapter and upon the faithful and honest handling of farm products in accordance with the terms of this chapter. Said bond shall be to the State in favor of every producer-creditor of farm products grown within the State of California. . . . *In case of failure by a processor to pay* producer-creditors for farm products received from said pro-

ducer-creditors, *the director shall proceed forthwith* to ascertain the names and addresses of all producer-creditors of such processor, together with the amounts due and owing to them and each of them by such processor, and shall request all such producer-creditors to file a verified statement of their respective claims with the directors. . . .

"Upon ascertaining all claims . . ., the director may then make demand upon the bond on behalf of those claimants whose statements have been filed. . . . Upon the refusal of the surety company to pay the demand, the director shall thereupon bring an action on the bond in behalf of said producer-creditors." (Emphasis added.)

It is clear from a reading of the above quoted statute, that an important question in this controversy is when did the statutory "failure to pay" occur? The trial court concluded that the causes of action arose sometime after March 24, 1949.

The parties filed a stipulation in open court on March 19, 1953, stating that the facts contained in the statement were true. Certain specific accounts of creditors were set out in detail, and it was stipulated that these were representative of all accounts listed in the complaint.

The first cause of action is based on the claims of creditors Abruzzini and Perino. Abruzzini delivered prunes to Clara-Val on 26 different occasions from August 24 through November 27, 1946. A payment of $26,438.89 appears in the debit column for October 10, and the specific deliveries paid for at that time are listed by the delivery tag numbers. All deliveries up to that time were then paid for except the first delivery on August 24. That delivery plus two more in October are then stated as a new credit balance of $4,934.27. No further payments were made in 1946, and after the November deliveries, on November 27, a new credit balance of $14,261.35 is stated. The account for 1947 shows no deliveries, but debits of payments on April 9, June 13, September 13, October 24, which are not listed as payments for specific deliveries. The balance of $3,166.66 is carried forward to 1948. One payment was made in 1948, and the final one on March 24, 1949, leaving a credit balance of $2,280. A similar type of account for Perino, with the final payment on March 4, 1949, shows a final balance due him of $357.12. The second cause of action involves similar accounts of numerous creditors for deliveries of prunes, apricots, peaches, apples and other commodities during the period May 15, 1947 to May 14, 1948.

Financial difficulties arose which were brought to the atten-

tion of the Director of Agriculture on March 3, 1948. Clara-Val advised the department that it was calling a meeting of grower-creditors on March 22, 1948, for the purpose of explaining arrangements for payments on the balances due them. A department representative attended this meeting at which the attorney for the debtor expressed the opinion that Clara-Val could eventually pay 100 cents on the dollar. He outlined a plan for payment of 50 cents on the dollar by April 10, and pro rata payments on the 10th of each month thereafter. The growers agreed to work along with the company, and asked the department to request the two growers who had complained to withhold their claims for the present.

On April 10 no payments were made, hence an investigational hearing was held on April 28, 1948, attended by grower-creditors. A financial statement showing assets of $331,937.90 and liabilities of $358,117.05 was exhibited by the president of the Clara-Val and refinancing plans were outlined by him. The department requested that it be furnished with an inventory of assets. Payments were made thereafter on grower-creditor accounts on April 23, 1948, June 23, 1948, July 1948, and one payment to three growers prior to the July payment, September 4, 1948, December, 1948, and March 24, 1949, totaling $61,694.12.

The efforts of Clara-Val to refinance were unsuccessful. On November 13, 1950 the secretary sent out notices of a bankruptcy sale of the equipment and real estate to be held in December. The foreclosure sale brought $14,000 less than necessary to meet the Bank of America's claim and that of the second mortgage holders, leaving nothing for creditors.

Defendant and appellant gave notice of the cancellation of the processor's bond in December of 1948, to take effect January, 1949. Forms for submission of verified claims were mailed to producer-creditors by the director on December 14, 1950. The final verified claim was received on June 7, 1951. Demand on the bond was made on June 15, 1951. After refusal by appellant to pay, this action was filed on July 8, 1952.

Appellant contends that the debtor's obligation to pay for the farm products arose when the products were received by it, citing section 1762 of the Civil Code which provides that *unless otherwise agreed* delivery of the goods and payment of the price are concurrent conditions. Accordingly, each load of produce delivered would constitute a separate contract, and there would be a failure to pay when payment was not made

following each delivery, hence the statute of limitations would commence to run on the bond. At any time after the deliveries of produce the creditors could have filed suit against the debtor to recover judgment. The date of the last delivery herein is on November 13, 1947, more than four years and seven months before suit was brought.

Respondent contends that section 1762 of the Civil Code is not applicable here for the debtor and the producer-creditors dealt upon a book account basis. While there is no evidence offered in this record as to the nature of the transaction between processor and producer-creditor, other than the accounts for each creditor, it is respondent's contention, apparently, that these accounts are sufficient to show that the parties dealt upon a book account basis. In such case the statute of limitations could therefore never run against the principal or the surety as long as any payment in any amount was made within a four year period. This would be true, of course, if the surety's undertaking was to indemnify creditors against loss by reason of the principal's failure to eventually pay his accounts. In such case the surety might not be exonerated of his liability for transactions carried out in 1946-1947 for many years to come.

Respondent has admitted that the controversy centers about the issue: When did the statutory failure to pay occur, for the agreement in the bond is to indemnify the producer-creditors against failure to pay. The condition stated therein is that the surety shall be discharged if the principal complies with the provisions of chapter 9, division 6, of the Agricultural Code, ''and shall faithfully and honestly handle farm products and pay in full for them as such licensed Processor for said license period [May 15, 1946-May 14, 1947, and each year thereafter till cancelled].'' Clearly, then, we must look to the Agricultural Code to determine whether it offers any solution to the meaning of the phrase ''failure to pay.''

That the statute here involved does not contemplate that delivery of the goods and payment of the price shall be concurrent conditions, as contended by appellant, seems to be obvious from the very language of section 1300.1a which requires a bond before the issuance of a license to any processor ''who buys or otherwise takes title to or possession of farm products from the producer thereof, except by payment to the producer at the time of obtaining such possession and control, of the full agreed price . . .'' A cash buyer under the Produce Dealers Act is exempt from the bond provision.

(See Agr. Code, § 1261(h); 7 A.G. 373.) Respondent is therefore correct in its conclusion that "failure to pay" did not occur on the date of delivery of each item in the accounts.

That "failure to pay" is not limited to conditions of insolvency or bankruptcy is also obvious, for the latter part of section 1300.1a requires the filing of a new bond by the producer after a recovery is had on the bond sued upon, otherwise his license as a processor will be revoked. "Failure to pay" is not then, identical with "inability to pay."

Neither party has made any reference to section 1300.4 of the Agricultural Code which defines the duty of the processor to pay for farm products. This definition is contained in the section dealing with revocation and suspension of licenses, payment for products, and procedure on insolvency. The duty to pay is there defined as follows: "Every processor *must pay* for farm products delivered to him or it at the time and in the manner specified in the contract with the producer, *but if no time is set by such contract, or at the time of said delivery, then within 30 days of the delivery or taking possession of such farm products.*" (Emphasis added.)

In the present case no evidence was offered of any special contracts. Hence we have only the fact of delivery of the produce, the price, and the dates of delivery. No evidence of any custom as to dealing between processor and producers was introduced. Therefore, in the absence of any evidence of agreements made, it must be held as a matter of law that payment for each delivery was due 30 days from the date it was made, and if not so made, the statutory failure to pay had occurred. All deliveries were made herein during the 1946-1947 and the 1947-1948 harvest seasons. The last deliveries here involved were apparently made in November 1947. Certainly, then, by January 1948, there had been a "failure to pay" on the part of the principal as to even the last of these accounts.

The Director of Agriculture knew of the situation by March 3, 1948. Although after the "failure to pay" comes to his attention he has the duty to "proceed forthwith" under the statute to collect the names and addresses of all producer-creditors, and then request them to file their verified claims within 60 days of the request, he is not *required* by the statute to proceed against the surety, as contended by appellant, but he *may* proceed against the surety. Undoubtedly, great discretion is allowed to the director in working out such a

problem. On a bond such as that herein, if he proceeded immediately he could recover only $5,000 for claims for each period, and such a suit if the surety declined to pay, might affect the processor's business adversely, making recovery of the remainder of the accounts improbable. Here, by working along with the processor, there was a recovery for the creditors of $61,964.12.

However, the fact that the director may decide with the creditors that it is to their best interest to give more time to the principal to meet his obligations is in our opinion, the granting of an extension of time, which generally under the law of suretyship is considered a material alteration which discharges the surety. (*Braun* v. *Crew*, 183 Cal. 728 [192 P. 531]; *Boteler* v. *Conway*, 13 Cal.App.2d 79, 82 [56 P.2d 587]; *Driscoll* v. *Winters*, 122 Cal. 65, 66 [54 P. 387]; § 2819, Civil Code.) While in the case of *Mortgage Guar. Co.* v. *Chotiner*, 8 Cal.2d 110, 122 [64 P.2d 138, 108 A.L.R. 1080], the defense of extension of time is referred to as ''one of the more technical suretyship defenses,'' we find no case which has abrogated the use of this defense in this state.

The general rule is that the liability of a surety accrues at the same time as that of the principal. And a cause of action upon a bond conditioned to do a certain act accrues as soon as there is a default in performance. (23 Cal.Jur. 1049, § 42.) The default in performance occurred here when there was a failure to pay 30 days after delivery. The creditor's cause of action arose then, for he could have then sued the processor at any time thereafter, and he could not indefinitely extend the statute of limitations from running by a failure to make a demand. (16 Cal.Jur. p. 492, § 95; *Harrigan* v. *Home Life Ins. Co.*, 128 Cal. 531 [58 P. 180, 61 P. 99].)

The agreement between the creditors and the debtor to grant an extension of time to the debtor to pay was a material alteration of the original agreement to pay which discharged appellant surety. The statute of limitations, section 337, Code of Civil Procedure, however, runs against the bond sued upon which means that suit would have to be commenced on the bond within four years from the original obligation to pay. Any agreement extending the time of the debtor to pay could not affect the running of the statute of limitations on the bond because the surety on the bond was not a party to the extension agreement.

The last delivery was made on November 13, 1947, over

four years elapsed after December 13, 1947, before suit was filed by the director on the bond here involved. We hold therefore that this suit was barred under section 337, Code of Civil Procedure.

 It cannot be doubted that from the facts herein stipulated to be true, an extension of time was granted to the debtor. Creditors who had filed complaints were asked to withdraw them at the meeting of March 22, 1948, and a plan for payment on installments was outlined by the attorney for the company to which the growers agreed. The surety was not a party to this agreement, and there is nothing in the record from which it can be inferred that it assented thereto. The only testimony in the record as to the time when the financial difficulties of the principal first came to the surety's attention shows the date to have been sometime in December of 1948, several months after the creditors' meeting had been held.

Respondent contends that the strict rules of suretyship have no application to this type of bond, citing *Los Angeles Stone Co.* v. *National Surety Co.*, 178 Cal. 247, 251-252 [173 P. 79]. That case involved a labor and material bond requiring the surety to pay if the principal failed to pay. The extension of time involved therein was an extension of time for doing the work under the building contract. The opinion pointed out that there was no material alteration because the surety's obligation was not for the performance of the building contract which it was claimed has been altered, but was independent thereof and for a wholly different purpose, namely, for the benefit of persons furnishing labor and material. It was further noted that the claimants had filed their claims within the time required by law. If in the cited case, the laborers and materialmen had met after the date on which they could have sued the principal and without the surety's knowledge had agreed to an extension of time, then the case would be parallel to the case now before us.

In view of the fact that the appellant surety was discharged because of a material alteration of the obligation of the principal to pay without the consent of the surety and for the further reason that the statute of limitations has run barring suit on the bond in question, the judgment must be and is hereby reversed.

Judgment reversed.

Nourse, P. J., and Dooling, J., concurred.